**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| YEVONNE POWERS, individually and on behalf of others similarly situated, | ) ) | Case No. 3:24-cv-00794 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) | **Jury Trial Demanded** |
| Defendant. | ) ) | |

**COMPLAINT
<u>CLASS ACTION</u>**

1.     Liberty Mutual Insurance Company ("Liberty Mutual" or "Liberty") is one of the most prolific robocallers in the United States, launching tens of thousands of prerecorded message telemarketing "robocalls" and text messages into the State of Indiana each month in attempts to gain new customers.

2.     Liberty uses robocalls for this outreach instead of live operators, because it does not know if the people it is calling are truly interested in its products and services.

3.     Liberty does not know if its call recipients are truly interested because it purchases phone numbers to call from "Lead Aggregators," which are companies that purchase and sell marketing leads.

4.     Lead Aggregators purchase the leads they sell to Liberty from "Lead Generators," which are companies that operate websites where consumers may enter their information, purportedly to request information which – unbeknownst to the consumer – is shared with myriad entities, each of which claim to have "prior express written consent" to robocall the consumer.

5.     Although the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227,

requires that persons that gather consumer "consent" must provide the consumer an agreement that clearly and conspicuously says that the consumer agrees to receive robocalls from the seller, and the consumer signs such, this never happened with regard to Liberty for a substantial portion of its calls.

6.      For example, at least 80% of the 2023 and earlier "consent" data that in Liberty's vendor Jornaya's files for robocalls, fails to list Liberty as an entity that the consumer consents to receive calls from on the same web page as the place where the consumer allegedly submitted their telephone number.

7.      Instead of an agreement that simply and clearly says that, in signing, the consumer agrees to receive robocalls from or on behalf of a single entity Liberty Mutual, Lead Generator websites' agreements in 2023 and earlier list dozens, hundreds, or even *thousands* of entities in a hyperlink to a different web page.

8.      Moreover, at least 80% all or nearly all of the web page disclosures Liberty has relied upon for "consent" to make its robocalls in 2023 and earlier blend the TCPA's required disclosures with advertising copy and/or other unrelated disclosures or statements.

9.      The upshot is that consumers who place their phone numbers into a Lead Generator website wind up being inundated with dozens – or *hundreds* – of telemarketing calls from multiple companies – including Liberty – that they did not agree to receive calls from or about.

10.     And because callers like Liberty usually have no relationship with the Lead Generators that originate the leads, and do not know the "chain of title" for the leads, there exists no meaningful way to make the calls stop.

11.     Even if a consumer demands that calls cease during every call received, the Lead

Aggregator can keep selling the lead over and over to different entities that purport to have consent.

12.     Further, in relying on these deficient leads, callers – including Liberty – also frequently fail to scrub their call lists to avoid initiating telephone solicitations to residential phone numbers on the National Do Not Call Registry ("NDNCR"), in violation of the TCPA's prohibition against such, 47 C.F.R. § 64.1200(c)(2). This happened in Plaintiff's case, as well.

13.     Given the automated nature of robocall violations, and the cost of litigation as compared with individual recoveries, a class action is the only practicable means of obtaining redress for Liberty Mutual's illegal, prerecorded-voice and NDNCR-violative calls, and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## INTRODUCTION

14.     Advancements in telephone dialing technology by the 1980s and 90s made reaching a large number of consumers by telephone easier and more cost-effective.  However, this technology has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money.  As a result, the federal government and numerous states have enacted legislation to combat these widespread telecommunications abuses.  As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes….  Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

15.     As is relevant here, federal law under the TCPA prohibits "mak[ing] any call

(other than a call made for emergency purposes or made with the prior express consent of the called party) using … an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii).  The TCPA provides for injunctive relief and the greater of actual damages or $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated.  47 U.S.C. § 227(b)(3).

16.    An affirmative defense is available if before the calls the seller (here, Liberty) first obtains a signed, written agreement with Plaintiff, that identifies the phone number to be called, and contains a "clear and conspicuous disclosure" that:

> (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the person … telemarketing calls using [a] prerecorded voice; and
>
> (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

47 C.F.R. § 64.1200(f)(9).

17.    In *In re Urth Access, LLC*, EB File No. EB-TCD-22-34232, 2022 WL 17550566, at *6 (FCC Dec. 8, 2022), the FCC considered a "consent farm" scheme (substantially similar to that which Liberty relies upon here), and found Urth Access' consent procedures wanting:

> … for telemarketing calls, the Commission requires the caller to provide a "clear and conspicuous disclosure" when obtaining prior express written consent.
>
> [Urth Access'] websites included TCPA consent disclosures whereby the consumer agreed to receive robocalls from "marketing partners."
>
> These "marketing partners" would only be visible to the consumer if the consumer clicked on a specific hyperlink to a second website that contained the names of each of 5,329 entities.
>
> We find that listing more than 5,000 "marketing partners" on a secondary website is not sufficient to demonstrate that the called parties consented to the calls from any one of these "marketing partners."

(paragraph breaks supplied; emphasis added).

18.     The FCC has subsequently reaffirmed that placing a company's name in a list of thousands on a separate webpage is "abusive" to consumers, and does not constitute valid consent. *In re TCPA: Closing the Lead Generator Loophole Order*, __ FCC Rcd. __, 2023 WL 8826682, ¶¶ 30-53 (Dec. 18, 2023), available at: https://www.fcc.gov/document/fcc-closes-lead-generator-robocall-loophole-adopts-robotext-rules (the "Lead Generator Loophole Ruling").

19.     The TCPA's NDNCR rule also provides: "No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). The TCPA provides for injunctive relief and the greater of actual damages or up to $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated.  47 U.S.C. § 227(c)(5).

20.     State laws also protect consumers from improper telemarketing. Relevant to Virginia consumers like Plaintiff Powers here, Virginia likewise prohibits initiating or causing to be initiating a telephone solicitation call to a telephone number on the National Do Not Call Registry. Va. Code § 59.1-514.B. Such law also provides for damages, injunctive relief, and/or attorneys' fees and costs. Va. Code § 59.1-515.

## PARTIES

21.     Plaintiff Yevonne Powers is a natural person who resides in Bedford County, Virginia. Ms. Powers received the calling at issue in this case on her residential cell phone number. Plaintiff is the subscriber to her phone number, which is connected to a personal rather

than business account with her carrier. Plaintiff uses her phone for personal rather than business purposes.

22.    Plaintiff's residential phone number has been on the National Do Not Call Registry since approximately 2006.

23.    Defendant Liberty Mutual Insurance Company is a Massachusetts corporation headquartered at 175 Berkeley Street, Boston, MA 02116. Liberty Mutual does regular and continuous business in Indiana, including in this District. Liberty Mutual maintains physical offices in Indiana, including at 3454 Douglas Rd., Ste. 220, South Bend, IN 46635, in this District.

24.    Liberty's TCPA marketing lead purchasing, prerecorded message calling and compliance is overseen by personnel who are based in – and operate from – this District, just outside of South Bend. Upon information and belief, such personnel work out of Mishawaka, Indiana.

## JURISDICTION AND VENUE

25.    This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's TCPA claims. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (2012).

26.    The Court has supplemental jurisdiction over Plaintiff's Virginia state law claims pursuant to 28 U.S.C. § 1367, because they are based on the same calls and so related to Plaintiff's federal TCPA claims that they form part of the same case or controversy.

27.    The Court also has Class Action Fairness Act jurisdiction because, on information and belief (including based on the automated nature of Liberty Mutual's calls and its size as one of the largest insurance companies in the country), the nationwide class is comprised of at least

ten thousand members, at least one class member is a citizen of a different state from where any Defendant is a citizen, and because the aggregate damages exceed $5,000,000, exclusive of fees, costs and interest.

28.    Liberty Mutual exploits the Indiana market by blanketing its consumers with robocalls, relying upon the "abusive" consent practices described herein. Although she lives in Virginia, Plaintiff Powers was called pursuant to the same calling and consent policies and procedures as the tens of thousands of calls Liberty orchestrated out of this District, both to consumers in Indiana and elsewhere.

29.    Defendant systematically, continuously, and deliberately did and attempted to do business in this District and throughout Indiana, and generated revenue as a consequence of resulting sales to Indiana consumers—including through the telemarketing calls at issue here. And not only that, but Liberty Mutual thereafter performs on those sales by providing the insurance-related products and services marketed and purchased during its telemarketing calls to Indiana consumers.

30.    Liberty Mutual purposefully availed itself of the privilege of doing business in Indiana, and purposefully directed its business activities into this state—and it is those systematic policies and practices used for contacts into this forum from which the claims of Plaintiff and the other class members in this matter arise out of or relate.

31.    Plaintiff's and the class members' injuries here directly relate to (and, indeed, arise out of) Liberty Mutual's physical presence in and affirmative efforts to advertise to and serve the Indiana market, and maintenance of this action in this District therefore does not offend traditional notions of fair play and substantial justice. The Court has personal jurisdiction over Defendant.

32.     Venue is appropriate in this District because Liberty made thousands (or millions) robocalls pursuant to the same "abusive" consent policies and practices into this District, and because its TCPA marketing lead purchasing, prerecorded message calling and compliance is overseen by personnel in this District. Venue is also appropriate because Liberty's TCPA marketing lead purchasing, prerecorded message calling, and compliance was overseen by personnel who were (and are) based in – and operate from – this District.

## FACTS

33.     Liberty Mutual is engaged in a prolific prerecorded-voice call campaign to American consumers, robocalling many millions of consumers' residential and cellular telephones, without proper consent, over the course of several years.

34.     Instead of obtaining marketing leads directly from consumers, Liberty purchases the phone numbers it robocalls from Lead Aggregators, who themselves purchased the leads from still-further-removed, third-party Lead Generators.

35.     Lead Generators generally obtain their leads from interactions on websites where someone enters their personal information and clicks a button to receive information.

36.     The vast majority of the websites of the Lead Generators whose leads Liberty purchases purport to obtain consent for thousands of companies at once through a single click of the mouse. This process is demonstrated below.

37.     What is more, the list of companies that the consumer purportedly "consented" to receive calls from do not appear on the web page the consumer typically visits.

38.     Instead, the list appears in a hyperlink to "Marketing Partners" or "Provider Network" or similar, in the fine-print disclosures on the web page.

39.     Lead Generation websites' references to "Marketing Partners" or "Provider

Network" in the context of Liberty Mutual is misleading, because Liberty generally has no relationship with these companies as to lead generation.

40.    Once the consumer clicks the "submit" button, their personal information goes through a vigorous sale-and-resale process to multiple buyers, each of which believe they have consent to call the consumer.

41.    Liberty's process for robocalling consumers is to purchase lead information – including telephone numbers – from a Lead Aggregator such as All Web Leads, EverQuote, Quote Wizard or similar.

42.    Liberty relies upon a TCPA compliance company called Jornaya to assist in making sure it has "consent" to call the leads it purchases, though such "consent" does not satisfy the statute's requirements or meaningfully reflect the consumer's authorization for Liberty's calls.

43.    Liberty keeps track of the "consent" disclosures through its vendor, Jornaya.

44.    Jornaya's interface, to which Liberty pays substantial sums to access, looks similar to the following:



45.    Liberty's attorneys and compliance department determine how strict – or loose – the parameters for which leads are purchased and called are, as depicted above.

46.    For example, one part of Jornaya's service was designed to notify its customers if there is indicia of fraud in connection with the lead, and another assesses the font size, color, and other attributes of the TCPA consent disclosures.

47.    Additionally, although the TCPA requires that "prior express written consent" occur through a signed, written agreement that contains specific disclosures, 47 C.F.R. § 64.1200(f)(9), the leads Liberty purchases and calls fail to adhere to the E-Sign Act's separate requirements for a valid electronic disclosure and signature, 15 U.S.C. § 7001. This independently makes Liberty's attempt to use them as "consent" invalid.

48.     The E-Sign Act requires, among other things, that the consumer separately consents to proceed electronically before receiving the requisite TCPA disclosures (including by receiving the separate E-Sign Act disclosures identified in 15 U.S.C. § 7001(c)(1)), and truly intends to "sign" the record.

49.     As one can see below, none of the disclosures purportedly provided to Plaintiff directly mention the E-Sign Act at all, let alone purport to satisfy its requirements.

50.     Upon information and belief, Liberty does only a perfunctory check into whether a Jornaya token is authentic, but does not thereafter verify the authenticity of the lead.

51.     As one can see below, none of the disclosures purportedly provided to Plaintiff directly mention the E-Sign Act at all, let alone purport to satisfy its requirements.

**Plaintiff Powers**

52.     Plaintiff Powers is the subscriber and user for residential cellular telephone number 540-xxx-0201 to which Liberty Mutual has made multiple, unsolicited calls using an artificial or prerecorded voice.

53.     For example, Liberty Mutual called Powers using prerecorded messages from caller ID 513-230-7972, nine times between December 3, 2020 and December 7, 2020.

54.     These calls were initiated to play a marketing message, for the purpose of trying to get Plaintiff to buy Liberty insurance.

55.     Liberty also sent Powers an advertising text message on December 3, 2020, initiated to try to sell her its insurance.

56.     The marketing lead that caused these calls originated with an unknown Lead Generator that used the following web form to induce Powers to enter her information:



57.     The part of this page that says "Providers Include:" has nothing below it.

58.     Jornaya keeps track of the "fine print" consent language such as that in the image above, through the portal depicted several pages, supra.

59.     A virtual video of the entire alleged lead generation process as allegedly preserved by Jornaya is available at: https://vp.leadid.com/playback/9E3AC473-5131-85B5-3081-33A1FFB9C939/1607025827.6089?key=1607025777228.

60.     Jornaya did not capture the green hyperlinked portion of the above disclosures concerning "our marketing and re-marketing network," and neither Liberty nor Jornaya knows or keeps track of whether or not Liberty was listed at the time this lead was generated.

61.     Upon information and belief, Liberty was <u>not</u> listed on the above landing page as a "provider".

- 13 -

62.     What is more, the final web page of the process for this lead – which appears *after* the consumer's information has already been submitted – states that Powers was matched up with Progressive, The Zebra, National Family Assurance and Allstate, but does <u>not</u> mention Liberty Mutual.

63.     Plaintiff did not authorize or intend to authorize Liberty Mutual to robocall her cell phone number as to the calls at issue.

64.     Liberty made another wave of prerecorded message calls to Powers from caller ID (540) 707-5728, with approximately eight calls and one text message between January 27, 2020 and January 31, 2020.

65.     These calls were initiated to play a marketing message, for the purpose of trying to get Plaintiff to buy Liberty insurance.

66.     According to Liberty's TCPA compliance vendor Jornaya, Powers visited an InsuredNation website on her mobile device, and entered her information in the form below. A mobile phone screen is too small to display the entire disclosure section, so Plaintiff has pasted that section on the right below:

- 14 -



67.     A virtual video of the entire alleged lead generation process as allegedly preserved by Jornaya is available at: https://vp.leadid.com/playback/24019C78-6D0E-9EF5-3724-4CF0619473F1/1703087059.3659?key=1580161407875.

68.     Jornaya did not capture the hyperlinked portion of the above disclosures concerning "marketing partners (listed here)," and Liberty does not know what entities (if any) were listed at the time this lead was generated.

69.     Upon information and belief, at the time of the lead event clicking on "marketing

partners (listed here) hyperlink would return a web page similar to Ex. A, with hundreds or thousands of unrelated entities, each of which – like Liberty Mutual – purport to have consent to robocall Powers' cell phone number.

70.     Although she filled out the above form, Plaintiff did not authorize or intend to authorize Liberty Mutual to robocall her cell phone number as to the calls at issue.

71.     Liberty Mutual's violations were negligent. Alternatively, they were willful and knowing.

72.     Liberty Mutual has been sued in the past for similar telemarketing violations, and its executives and legal teams were on actual notice that its practices were resulting in nonconsensual calls to consumers' phones like those alleged here. *See, e.g., Johansen v. Liberty Mutual Group Inc.*, No. 1:15-cv-12920 (D. Ma.) (Liberty Mutual settled TCPA do-not-call violation claims with consumer, and then tried to seek indemnity from its third-party vendors); *Smith v. Liberty Mutual Ins. Co.*, No. 1:20-cv-11583 (D. Ma.) (consumer sued Liberty Mutual for alleged TCPA robocall violations). Nonetheless, Liberty Mutual has continued to reap the benefits of nonconsensual prerecorded calls, choosing profits over consumer privacy and safety.

73.     Plaintiff and the other class members have been damaged by Liberty Mutual's calls. Their seclusion and privacy was improperly invaded, Liberty Mutual's calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. Liberty Mutual's calls were annoying and a nuisance, and wasted the time of Plaintiff and the class. *Gadelhak v. AT&T Servs., Inc*., 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (finding TCPA violations present concrete injury-in-fact sufficient for Article III standing); *Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (2012) (noting congressional findings of consumer "outrage" as to autodialed and prerecorded-voice calls).

## CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and

(b)(3), on behalf of classes consisting of:

**Robocall Class**: All cellular subscribers and/or residential subscribers in the United States whose telephone number Liberty Mutual, or some third party on its behalf, called using an artificial or prerecorded voice, where (a) the originating Lead Generator website did not mention Liberty in any non-hyperlinked TCPA disclosure Jornaya logged applicable to the alleged lead, and (b) there was no separate consent obtained to proceed electronically (e.g., pursuant to the E-Sign Act) before TCPA consent was allegedly obtained.

**NDNCR Class:** All persons within the United States whose residential cellular or landline numbers Liberty Mutual or someone on its behalf called more than once in a 12-month period for purposes of encouraging the purchase of Liberty's consumer (i.e. non-commercial) products or services, where (1) the person's phone number had been registered with the National Do Not Call Registry for more than 31 days at the time of the call; and (2) Liberty's records do not reflect either (a) a "one-to-one" signed, written agreement between the person and Liberty which states in a clear and convincing manner that the consumer agrees to be contacted by Liberty at the phone number called, or (b) that the person had transacted business with Liberty in the past 18 months, or made an inquiry directly with Liberty about its products or services within the past 3 months, without a subsequent do-not-call request.

75.    Upon information and belief, there were more than 1,000 persons with Indiana

area codes who received calls as identified in each of the Robocall Class and NDNCR Class

definitions, in 2021 alone.

76.    Excluded from the class are opt-in forms that reference an arbitration agreement.

77.    Common questions of law or fact exist as to all members of the classes, which

predominate over any questions solely affecting any individual member, including Plaintiff.

Such questions common include but are not limited to:

a.    Whether the calls to Plaintiff and the Robocall Class were made using an

artificial or prerecorded voice as such terms are defined or understood under

the TCPA and applicable FCC regulations and orders;

- 17 -

b.  Whether Liberty had valid consent of the subscribers who received such calls, before making such calls;

c.  Whether Liberty had established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the TCPA's National Do Not Call Registry regulations;

d.  Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other class members are entitled to treble damages under 47 U.S.C. § 227(b)(3) and § 227(c)(5).

78.   Plaintiff's claims are typical of the claims of the other members of the classes. The factual and legal bases of Liberty Mutual's liability to Plaintiff and the other class members are the same: Defendant violated the TCPA by causing nonconsensual, artificial- or prerecorded-voice telemarketing calls to be made to the cellular telephone number of each member of the Robocall Class, and by causing telephone solicitations to be made to the residential telephone subscribers of the NDNCR Class despite their phone numbers' registration on the National Do Not Call Registry.

79.   Plaintiff will fairly and adequately protect the interests of the classes.  Plaintiff has no interests that might conflict with the interests of the classes.  Plaintiff is interested in pursuing her claims vigorously, and she has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

80.   Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual action

would entail.  There are, on information and belief, thousands of members of each class, such that joinder of all members is impracticable.

81.    No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

82.    Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the classes, thereby making relief appropriate with respect to the classes as a whole.  Prosecution of separate actions by individual members of the classes, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct.

83.    The identity of the classes are, on information and belief, readily identifiable from Liberty Mutual's or its vendors' records.

## COUNT I
### Robocall TCPA Violations

84.    Plaintiff re-alleges and incorporates all prior allegations. Plaintiff brings this count on behalf of herself and the Robocall Class.

85.    It is a violation of the TCPA to call cellular or residential telephones and play an artificial or prerecorded voice.

86.    Liberty Mutual initiated or caused to be initiated calls to the cellular and residential telephone numbers of Plaintiff and the other members of the Robocall Class defined above using an artificial or prerecorded voice.

87.    These calls were made even though Liberty did not have prior express consent from subscribers who received such calls.

88.    These calls and violations were willful or knowing.

89.    To the extent that some of the calls to Plaintiff and the Robocall Class were made by vendors of Liberty Mutual, Liberty Mutual is liable for those calls, too.

90.    Liberty has not altered the conduct complained of herein since this lawsuit was filed. Such obstinance warrants both (a) imposition of an injunction prohibiting Liberty from using robocalls until it shores up its consent policies and practice, and (b) treble damages.

91.    As a result of Liberty's conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and the other members of the Robocall Class were harmed and are each entitled to a minimum of $500 in damages for each violation; treble damages if violations are found to have been willful or knowing.

WHEREFORE, Plaintiff Yevonne Powers, individually and on behalf of the Robocall Class, respectfully requests that the Court enter judgment against Defendant Liberty Mutual Insurance Company for:

A.    Certification of the Robocall Class as alleged herein, and appointment of Plaintiff as class representatives and her attorneys as class counsel;

B.    Damages, pursuant to 47 U.S.C. § 227(b)(3);

C.    An injunction:

-    prohibiting Liberty Mutual from making – or accepting business derived from – prerecorded message calls, unless they have first obtained the express consent of the subscriber before making the call;

-    Requiring Liberty Mutual to engage a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of Liberty's outbound calls – including calls originating from lead generators – to ensure that Defendants had proper consent for robocalls, and (c) report the results of the above investigations to the Court and Plaintiff's counsel on a quarterly basis for no less than five years.

-    Requiring Liberty Mutual to include a working, automated IVR opt-

out mechanism at the beginning of any and all prerecorded-voice calls.

D.      Attorneys' fees and costs, as permitted by law; and

E.      Such other or further relief as the Court deems just and proper.

**COUNT II**
**National Do Not Call Registry TCPA Violations**

92.     Plaintiff re-alleges and incorporates all prior allegations. Plaintiff brings this count on behalf of herself and the NDNCR Class.

93.     It is a violation of the TCPA to initiate any telephone solicitation to a residential telephone subscriber who has registered his or her residential landline or cellular telephone number on the National Do Not Call Registry. 47 C.F.R. § 64.1200(c)(2).

94.     Liberty Mutual violated the TCPA by initiating or causing to be initiated multiple telephone solicitations to Plaintiff and the other members of the NDNCR Class in a 12-month period, despite those persons' registration of their telephone numbers on the National Do Not Call Registry.

95.     Liberty was not entitled to any "established business relationship," "prior express invitation or permission," or other defense that might privilege them to make these calls.

96.     These violations were willful or knowing.

97.     As a result of Liberty's violations of the TCPA's National Do Not Call Registry regulations, Plaintiff and the other members of the NDNCR Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

98.     Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

99.     To the extent Liberty did not physically "initiate" the calling at issue itself, Liberty is nonetheless liable based on theories of direct liability, actual authority, apparent

authority, and ratification (among others), for these calls were made on their behalf.

WHEREFORE, Plaintiff Yevonne Powers, individually and on behalf of the NDNCR Class, respectfully requests that the Court enter judgment against Defendant Liberty Mutual Insurance Company for:

A.      Certification of the NDNCR Class as alleged herein, and appointment of Plaintiff as class representatives and her attorneys as class counsel;

B.      Damages, pursuant to 47 U.S.C. § 227(c)(5);

C.      Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at preventing Defendant and its agents and (sub)vendors from violating the TCPA in the future;

D.      An injunction prohibiting Defendant from relying upon consent derived from third-parties such as lead generators, to try to establish an Existing Business Relationship, as well as a declaration to this effect, too;

E.      Attorneys' fees and costs, as permitted by law; and

F.      Such other or further relief as the Court deems just and proper.

## <u>COUNT III</u>
### National Do Not Call Registry VTPPA Violations

100.      Plaintiff re-alleges and incorporates all prior allegations. Plaintiff brings this count on behalf of herself, individually.

101.      The Virginia Telephone Privacy Protection Act ("VTPPA"), Va. Code § 59.1-514, provides that "[n]o telephone solicitor shall initiate, or cause to be initiated, a telephone solicitation call to a telephone number on the National Do Not Call Registry maintained by the federal government pursuant to the Telemarketing Sales Rule, 16 C.F.R. Part 310, and 47 C.F.R. § 64.1200."

102.    Va. Code § 59.1-515 provides that any natural person who is aggrieved by a violation of the VTPPA shall be entitled to initiate an action against any responsible person to enjoin such violation and to recover from any responsible person damages in the amount of $500 for a first violation, $1,000 for a second violation, and $5,000 for each subsequent violation, or up to $5,000 for all such violations where willful, at the Court's discretion.

103.    Plaintiff is entitled to statutory damages pursuant to Va. Code § 59.1-515, for each call Liberty caused to be made to her cell phone, as well as injunctive relief and reasonable attorneys' fees and costs.

104.    Because such violations were willful, Plaintiff is entitled to maximum statutory damages of $5,000 per call Liberty made to her phone, pursuant to Va. Code § 59.1-515.

WHEREFORE, Plaintiff Yevonne Powers, individually, respectfully requests that the Court enter judgment against Defendant Liberty Mutual Insurance Company for:

A.    Damages, pursuant to Va. Code §§ 59.1-515.A-B;

B.    Injunctive relief, pursuant to Va. Code § 59.1-515.D, aimed at preventing Defendant and its agents and (sub)vendors from violating the TCPA in the future;

C.    Attorneys' fees and costs, pursuant to Va. Code § 59.1-515.C; and

D.    Such other or further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: September 25, 2024

YEVONNE POWERS, individually and on behalf of others similarly situated

By: _/s/ Alexander H. Burke_

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*

## Document Preservation Demand

Plaintiff demands that Defendant preserve all records, and direct that all (sub)vendors, agents and other third parties with relevant documents or data do so, too. Defendant should obtain all call data, lead data, and other relevant documents from all applicable (sub)vendors or third parties – particularly if they are located overseas – ***before*** terminating or otherwise taking any steps that might alter its relationship with them. Our experience is that lead generators and other vendors often remove customer access to call records upon termination. Defendant should gather these records first, before taking any steps that might remove access to these types of records. Plaintiff will assist with reasonable costs of preservation; please contact the attorneys listed here to discuss.

## Do-Not-Call Request

Plaintiff hereby requests that Defendant stop any and all calling to her residential cell phone number (which has been previously provided to Liberty Mutual through counsel), whether such calling is made by Liberty directly or by a (sub)vendor.